# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| JEFFREY ALLEN DANGELO<br>868 Highland Avenue<br>Ft. Thomas, KY 41075 | : : : : | Case No. 1:09-cv-512<br><br>J. Barrett |
| Plaintiff, | : : | |
| v. | : : | **VERIFIED COMPLAINT FOR**<br>**DECLARATORY JUDGMENT** |
| TOTAL QUALITY LOGISTICS, LLC<br>4289 Ivy Pointe Blvd.<br>Cincinnati, OH 45245 | : : : : | |
| Defendant. | : | |

Plaintiff Jeffrey Allen Dangelo alleges as follows:

## PARTIES

1. Plaintiff Jeffrey Allen Dangelo ("Mr. Dangelo" or "Plaintiff") is a resident and citizen of the Commonwealth of Kentucky.

2. Defendant Total Quality Logistics, LLC ("TQL" or "Defendant") is an Ohio corporation and an employer within the meaning of both federal and Ohio state law.

3. Defendant employed Plaintiff in Ohio.

## JURISDICTION AND VENUE

4. This Court has personal jurisdiction over Defendant because Defendant is located and transacts business in this district.

5. This case arises under Ohio common law.

6. This Court has original jurisdiction under 28 U.S.C. § 1332 to hear this case because the parties are completely diverse as to citizenship and the amount in controversy exceeds $75,000.

7.      Venue is proper in this division because the events giving rise to this Complaint occurred in this district and division.

## FACTUAL ALLEGATIONS

**Defendant TQL**

8.      Defendant TQL is a transportation broker that brokers full truckload weight. It provides thousands of companies nationwide with services to facilitate their truckload freight shipments.

9.      TQL represents on its website (available for review at www.tql.com) that it currently has a customer base of over 6,000 companies.

10.     The company employs a total of over 1,000 employees, approximately half of whom are Logistics Account Executives ("LAEs").

11.     Ryan Legg is a former part-owner of TQL. He left TQL several years ago. He now owns a business called Megacorplogistics that competes with TQL. The company is based in North Carolina. Mr. Legg and his company wish to hire Mr. Dangelo.

12.     On information and belief, some 50,000-plus prospective customers exist in the U.S. economy.

**Plaintiff Dangelo**

13.     Mr. Dangelo is his family's primary breadwinner.

14.     Mr. Dangelo started working for TQL in late 2002 as an LAE. He started three months after graduating from college. Thus, Mr. Dangelo's professional experience is almost entirely in the transportation brokerage industry.

15.     From 2002 through 2009, Mr. Dangelo was an exemplary employee, receiving

excellent evaluations and consistent merit pay increases.

16. Mr. Dangelo moved into the LAE role.

17. During Mr. Dangelo's entire tenure with TQL, he worked exclusively in the Cincinnati area.

18. While in the role of LAE, Mr. Dangelo never handled more than 50 customers at any one time. This amounts to less than one percent of TQL's 6,000-plus customers.

19. TQL's annual revenue is approximately $500 million; in comparison, Mr. Dangelo generated between $2-2.5 million in revenue for TQL in 2008. Mr. Dangelo therefore generated less than one percent of TQL's annual revenue.

20. While in the role of LAE, Mr. Dangelo worked on a team that included a Logistics Coordinator named Kevin Payne. Mr. Payne assisted Mr. Dangelo in a variety of ways, including but not limited to making appointments, setting up telephone calls directly with clients, and e-mailing directly with clients. Mr. Payne had a very strong operational knowledge of the clients with whom Mr. Dangelo interacted.

21. While working for TQL, Mr. Dangelo started to grow disenchanted with TQL because he perceived that the company managed "by fear" rather than by encouragement. This concern grew particularly after Mr. Legg departed several years ago.

22. Mr. Dangelo left his employment with TQL in May 2009. He now wishes to work for Mr. Legg and Megacorplogistics.

23. Mr. Payne remained employed with TQL after Mr. Dangelo left his employment. He was well-equipped with the necessary knowledge of the clients with whom Mr. Dangelo interacted to transition them to other LAEs.

24. Mr. Dangelo was never in possession of any trade secrets during his employment with TQL. He has made no attempt to disclose confidential information to Mr. Legg, nor does he intend to do so in the future.

**The Agreement**

25. In 2008, Mr. Dangelo signed a document entitled "Employee Non-Compete Confidentiality, and Non-Solicitation Agreement" ("the Agreement"). He encloses an unsigned copy of this document as Exhibit A.

26. Paragraph 8(b) includes five separate requirements. It states:

Covenants. Employee agrees that, during the course of his or her employment . . . , and for a period of one (1) year after termination or cessation of Employee's employment for any reason:

(i) Employee will not, directly or indirectly, own, operate, maintain, consult with, be employed by (including self-employment), engage in, or have any other interest . . . in any Competing Business (as defined below), . . . ; *and*

(ii) Employee will not directly or indirectly, either as an employee, agent, consultant, contractor, officer, owner, or in any other capacity or manner whatsoever, whether or not for compensation, participate in any transportation-intermediary business that provides services in the Continental United States, including but not limited to any person or organization that provides shipping, third-party logistics, freight brokerage, truck brokerage, or supply-chain management services; *and*

(iii) Employee will not, directly or indirectly, solicit any Customer, Motor Carrier, client, consultant, supplier, vendor, lessee, or lessor, or take any action, to divert

business from TQL; *and*

(iv) Employee will not, directly or indirectly, interfere with, tamper with, disrupt, or attempt to disrupt any contractual or other relationship, or prospective relationship, between TQL and any Customer, Motor Carrier, client, consultant, supplier, vendor, lessee, or lessor of TQL; *and*

(v) Employee will not, directly or indirectly, employ, recruit, solicit, or assist others in employing, recruiting, or soliciting any person who is, or within the previous twelve (12) months has been, an employee of, consultant with, or been party to another business relationship with TQL.

(Exhibit A, Paragraph 8(b) (emphasis added).)

27. In turn, the Agreement defines "Competing Business" as "any person, firm, corporation, or entity that is engaged in shipping, third-party logistics, freight brokerage, truck brokerage, or supply chain management services in the Continental United States." (Exhibit A, Paragraph 8(g).)

28. The Agreement defines "Customer" as: "any individual, business, or other entity, for whom TQL has rendered any service, or with respect to which TQL has planned and/or made contact for the purpose of rendering any service, within twenty-four (24) months immediately preceding the termination or cessation of Employee's employment." (Exhibit A, Paragraph 8(g).)

29. The Agreement defines "Motor Carrier" as "any over-the-road shipper, carrier, trucker, or hauling business that has transported freight for any TQL Customer as a result of a relationship, dealings, arrangements, or communications with TQL, or with respect to which TQL has planned and/or made contact for this purpose, within the twenty-four (24) months

immediately preceding the termination or cessation of Employee's employment." (Exhibit A, Paragraph 8(g).)

30. The Agreement defines "solicit" as including but not limited to: "any efforts, in any form, intended to take business away from, intercept or interfere with the business of TQL, including relationships with TQL and its employees, customers, Motor Carriers, clients, consultants, suppliers, vendors, lessees, lessors, and employees, and specifically, including doing business with any Customer or Motor Carrier." (Exhibit A, Paragraph 8(g).)

31. The covenants apply to all 1,000-plus employees and 6,000-plus customers. Mr. Dangelo never contacted, knew or communicated with the vast majority of these employees and customers. While employed, at any one time, he estimates that he would have been in contact with *less than one percent* of all of the customers served by TQL.

32. The covenants also purport to block Mr. Dangelo from working anywhere in the industry for a year. In effect, Mr. Dangelo would be blocked from working for the estimated 40,000 companies who are not customers of TQL.

33. The Agreement also provides for venue of a dispute over its terms to be in the United States District Court for the Southern District of Ohio. (Exhibit A, Paragraph 9.)

## COUNT I

**(Declaratory Judgment)**

34. Plaintiff incorporates by reference the previous allegations as if fully rewritten herein.

35. Pursuant to Ohio Rev. Code § 2721.03, the Court is authorized to construe the terms of the parties' Agreements and enter a declaratory judgment articulating their respective

rights and obligations thereunder.

36. The Agreements are governed by Ohio law. Under Ohio law, non-competition provisions that are overbroad or otherwise unenforceable must be stricken or reduced.

37. Despite the clear and mandatory requirements of Ohio law, the restrictive covenants contained in the Agreements are void and unenforceable because, among other things, they do not contain a valid geographical restriction; because they are overbroad in that they include components of TQL's business in which Mr. Dangelo was never involved; because they relate to affiliates of TQL with which Mr. Dangelo was never employed; and because they are vague and unclear.

38. Plaintiff is entitled to a declaratory judgment that the restrictive covenants in the Agreements are void and unenforceable as a matter of law.

**WHEREFORE,** Plaintiff demands judgment against Defendant as follows:

(a) That a Temporary and Permanent Injunction be granted enjoining and restricting Defendant from threatening or seeking enforcement of the Non-Compete and Non-Solicitation restrictive covenants against Plaintiff;

(b) That a Temporary and Permanent Injunction be granted directing Defendant to release Plaintiff from the Non-Compete and Non-Solicitation restrictive covenants;

(c) That the Court issue an Order declaring the restrictive covenants in TQL's Non-Qualified Stock Option Agreements invalid and unenforceable as a matter of law;

(d) That Plaintiff be awarded all other legal and equitable relief to which he may be entitled.

Respectfully submitted,

 /s/ Megan E. Clark
Megan E. Clark (0065159)
Randolph H. Freking (0009158)
Trial Attorney for the Plaintiff
FREKING & BETZ, LLC
525 Vine Street, Sixth Floor
Cincinnati, OH  45202
Phone:  (513) 721-1975
Fax:  (513) 651-2570
*mclark@frekingandbetz.com*
*randy@frekingandbetz.com*