FILED
JAMES BONINI
CLERK

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

'09 JUL 21 PM 3: 40

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. CINCINNATI

| | | |
|---|---|---|
| JEFFREY ALLEN DANGELO<br>868 Highland Avenue<br>Ft. Thomas, KY 41075 | : | Case No. _____ |
| | : | J. __1:09CV512__ |
| Plaintiff, | : | **J. BARRETT** |
| v. | : | **PLAINTIFF'S MOTION FOR** |
| | : | **TEMPORARY RESTRAINING** |
| TOTAL QUALITY LOGISTICS, LLC | : | **ORDER AND PRELIMINARY** |
| 4289 Ivy Pointe Blvd. | : | **INJUNCTION AND** |
| Cincinnati, OH 45245 | : | **MEMORANDUM IN SUPPORT** |
| | : | |
| Defendant. | : | |

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff Jeffrey Dangelo

respectfully moves that the Court issue a temporary restraining order and preliminary injunction

enjoining and restricting Defendant Total Quality Logistics, LLC from threatening or seeking

enforcement of the restrictive covenants in the Employee Non-Compete, Confidentiality, and

Non-Solicitation Agreement between Plaintiff and Defendant. This motion is based on the

Verified Complaint. Accompanying this motion is a Memorandum in Support of this Motion.

Respectfully submitted,

Megan E. Clark (0065159)
Randolph H. Freking (0009158)
Trial Attorney for the Plaintiff
FREKING & BETZ, LLC
525 Vine Street, Sixth Floor
Cincinnati, OH 45202
Phone: (513) 721-1975
Fax: (513) 651-2570
*mclark@frekingandbetz.com*
*randy@frekingandbetz.com*

**MEMORANDUM IN SUPPORT**

## I.   **INTRODUCTION**

Plaintiff Jeffrey Dangelo seeks to prevent his former employer from enforcing restrictive covenants that impermissibly attempt to insulate the company from ordinary competition. Plaintiff moves that the Court issue a temporary restraining order and a preliminary injunction to enjoin Defendant Total Quality Logistics, LLC ("TQL") from threatening or seeking to enforce restrictive covenants with Plaintiff.

## II.   **STATEMENT OF FACTS**

### A.   **Defendant TQL.**

Defendant TQL is a transportation broker. (Verified Complaint ¶8.) It provides thousands of companies nationwide with services to facilitate their truckload freight shipments. (*Id.*) TQL represents on its website (available for review at www.tql.com) that it currently has a customer base of over 6,000 companies. (*Id.* ¶9.) The company employs a total of over 1,000 employees, approximately half of whom are Logistics Account Executives ("LAEs"). (*Id.* ¶10.)

### B.   **Plaintiff Dangelo.**

Mr. Dangelo began work in TQL's operations in late 2002 as an LAE. (*Id.* ¶14.) He started there shortly after graduating from college. (*Id.*) Thus, Mr. Dangelo's professional experience is limited almost entirely to the transportation brokerage industry. (*Id.*) From 2002 through 2009, Mr. Dangelo was an exemplary employee, receiving excellent evaluations and consistent merit pay increases. (*Id.* ¶15.) He moved from LAE to Sales Manager and back to LAE in early 2009. (*Id.* ¶16.) During Mr. Dangelo's entire tenure with TQL, he worked exclusively in the Cincinnati area. (*Id.* ¶17.)

1

While in the role of LAE, Mr. Dangelo never handled more than 50 customers at any one time. (*Id.* ¶18.) This amounts to less than one percent of TQL's 6,000 plus customers. (*Id.*) Likewise, Mr. Dangelo's revenue generation for TQL accounted for less than one percent of its annual revenue. (*Id.* ¶19.) Mr. Dangelo also worked on a team that included a Logistics Coordinator named Kevin Payne. (*Id.* ¶20.) Mr. Payne assisted Mr. Dangelo in a variety of ways, including but not limited to making appointments, setting up telephone calls directly with clients and e-mailing directly with clients. (*Id.*) Mr. Payne therefore had a strong operational knowledge of clients with whom Mr. Dangelo interacted. (*Id.*) Mr. Dangelo resigned his employment in May 2009 and now wishes to work for a competitor called Megacorplogistics. (*Id.* ¶22.) Megacorplogistics is based in North Carolina and is owned by Ryan Legg, a former part-owner of TQL. (*Id.* ¶11.) Mr. Payne remained employed with TQL after Mr. Dangelo left his employment, and he would have had the necessary knowledge of the clients with whom Mr. Dangelo interacted to transition them to other LAEs. (*Id.* ¶23.) Mr. Dangelo was never in possession of any trade secrets, has made no attempt to disclose confidential information to Mr. Legg and does not intend to do so in the future. (*Id.* ¶24.)

## C. The Agreement.

In 2008, Mr. Dangelo signed a document entitled "Employee Non-Compete, Confidentiality, and Non-Solicitation Agreement." (*Id.* ¶25.) It states:

**Covenants.** Employee agrees that, during the course of his or her employment . . . and for a period of one (1) year after termination or cessation of Employee's employment for any reason:

(i)     Employee will not, directly or indirectly, own, operate, maintain, consult

2

with, be employed by (including self-employment), engage in, or have any
other interest . . . in any Competing Business, . . . ; *and*

(ii)     Employee will not directly or indirectly, either as an employee, agent,
consultant, contractor, officer, owner, or in any other capacity or manner
whatsoever, whether or not for compensation, participate in any
transportation-intermediary business that provides services in the
Continental United States, including but not limited to any person or
organization that provides shipping, third-party logistics, freight
brokerage, truck brokerage, or supply-chain management services; *and*

(iii)    Employee will not, directly or indirectly, solicit any Customer, Motor
Carrier, client, consultant, supplier, vendor, lessee, or lessor, or take any
action, to divert business from TQL; *and*

(iv)    Employee will not, directly or indirectly, interfere with, tamper with,
disrupt, or attempt to disrupt any contractual or other relationship, or
prospective relationship, between TQL and any Customer, Motor Carrier,
client, consultant, supplier, vendor, lessee, or lessor of TQL; *and*

(v)     Employee will not, directly or indirectly, employ, recruit, solicit, or assist
others in employing, recruiting, or soliciting any person who is, or within
the previous twelve (12) months has been, an employee of, consultant
with, or been party to another business relationship with TQL.

(*Id.* ¶26.)

    In turn, the agreement defines "Competing Business" as "any person, firm, corporation,

3

or entity that is engaged in shipping, third-party logistics, freight brokerage, truck brokerage, or supply chain management services in the Continental United States." (*Id.* ¶27.) Additionally, the Agreement provides broad definitions of "Customer," "Motor Carrier," and "solicit." (*Id.* ¶¶28-30.)

## III.  ARGUMENT

When determining whether to grant a temporary restraining order, Ohio courts consider (1) whether the movant is likely to succeed on the merits of his underlying claim; (2) whether the movant will suffer irreparable harm if the order is not granted; (3) what injury to others will be caused by granting the motion; and (4) whether the public interest will be served by granting the motion. *Coleman v. Wilkinson*, 147 Ohio App. 3d 357, 358, 770 N.E.2d 637, 638 (2002) (citing *Corbett v. Ohio Bldg. Auth.*, 86 Ohio App. 3d 44, 49, 619 N.E.2d 1145, 1148 (1993)). Likewise, Ohio courts consider the same elements when deciding whether to grant a preliminary injunction. *Chapin v. Nameth*, 2009 Ohio 1025, at ¶16, 2009 Ohio App. LEXIS 898, at *6 (7th Dist., Mar. 5, 2009). A trial court's decision to grant either type of relief is a matter "solely within the discretion of the trial court, and a reviewing court will not disturb the judgment of the trial court in the absence of a clear abuse of discretion." *Corbett*, 86 Ohio App. 3d at 49 (citing *Garono v. State*, 37 Ohio St. 3d 171, 173, 524 N.E.2d 496, 498 (1988)).

### A.  Mr. Dangelo Is Likely To Succeed On The Merits Because The Restrictive Covenants Are Overbroad And Unreasonable.

A restrictive covenant not to compete may not be enforced beyond the extent to which it is reasonable. *Raimonde v. Van Vlerah*, 42 Ohio St. 2d 21, 25-26, 325 N.E.2d 544, 547 (1975). Such a restrictive covenant is reasonable only insofar as it is necessary to protect an employer's

4

legitimate interests, does not impose undue hardship on the employee and is not harmful to the

public. *Id.* at 26. Factors relevant to determining the reasonableness of a restrictive covenant

include:

> (1) *the absence or presence of limitations as to time and space*;
> (2) *whether the employee represented the sole contact with the customer*;
> (3) *whether the employee possessed confidential information or trade secrets*;
> (4) *whether the covenant seeks to eliminate competition that would be unfair to the employer or seeks to eliminate ordinary competition*;
> (5) whether the covenant seeks to stifle the inherent skill and experience of the employee;
> (6) whether the benefit to the employer is disproportional to the detriment to the employee;
> (7) *whether the covenant operates as a bar to the employee's sole means of support*;
> (8) whether the employee's talent that the employer seeks to suppress was actually developed during the period of employment; and
> (9) whether the forbidden employment was merely incidental to the main employment.

*Id.* at 25 (emphasis added). "In determining the validity of a covenant or agreement in restraint

of trade, each case must be decided on its own facts." *Id.* (internal quotations omitted).

The five restrictive covenants in this case are unreasonable because they impose an undue

burden on Mr. Dangelo that is grossly disproportionate to what is necessary to protect TQL's

legitimate interests. The covenants do not contain a valid geographical restriction; they prevent

Mr. Dangelo from working with TQL customers and prospective customers with whom he had

absolutely no contact while at TQL; and they even prevent Mr. Dangelo from working for

competitors in any capacity whatsoever, even if unrelated to his position at TQL. (Verified

Complaint ¶¶26-30.) Nor does Mr. Dangelo possess any trade secrets that would require this

Court's protection. (*Id.* ¶24.) The covenants go far beyond protecting TQL from unfair

competition to the point of insulating TQL from ordinary competition.

### 1. The Restrictive Covenants Do No Contain A Valid Geographical Restriction.

5

A restrictive covenant that contains no geographical limitation whatsoever is unreasonable. *See Extine v. Williamson Midwest, Inc.*, 176 Ohio St. 403, 406-07, 200 N.E.2d 297, 299-300 (1964), *overruled on other grounds, Raimonde*, 42 Ohio St. 2d at 24-25; *see also Duracote Corp. v. Ryan*, 1983 Ohio App. LEXIS 15123, at *3-6. In *Extine*, the *entire* court declined to enforce a restrictive covenant in "areas in the world where the employer . . . has no activity whatsoever and may never intend to engage in any activity in such a location." *Extine*, 176 Ohio St. at 406-07. Likewise, in *Segal v. Fleischer*, 93 Ohio App. 315, 319, 113 N.E.2d 608, 611 (1952), the First District Court of Appeals refused to enforce a five-year non-compete agreement with no geographical limitation because it was unreasonable.

A restrictive covenant that contains no geographical limitation whatsoever is still unreasonable even if the employee was critical to the success of the employer's business. *See, e.g., Parma Int'l, Inc. v. Bartos*, 1990 Ohio App. LEXIS 508, at *6-9 (9th Dist., Feb. 7, 1990). In *Parma*, the employee had been manufacturing radio-controlled cars since age 13 and developed a reputation for being an excellent radio-controlled car racer and designer. *Id.* at *2. The employee signed a five-year non-compete agreement and a three-year non-solicitation agreement with his employer, a radio-controlled car manufacturer, that contained no geographical limitation whatsoever. *Id.* at *3. During the employee's employment, he continued to race his employer's cars; won a world championship in 1984 using the employer's cars; was involved in designing, advertising and promoting the employer's products; and helped the employer grow into a $5-million-a-year business. *Id.* at *34. After a disagreement with the company president, however, the employee began operating in the same line of business as his former employer. *Id.* at *4. Despite how integral the employee was to his employer's success, the Ninth District Court of

6

Appeals still held that the three- and five-year restrictions with no geographical limitation whatsoever were unreasonable and reduced them to apply only for one year and within 25 miles of the employer's principal place of business. *Id.* at \*9.

Here, the restrictive covenants as written completely bar Mr. Dangelo from working for a similar business anywhere in the world. The agreement defines a "Competing Business" extremely broadly as "any person, firm, corporation, or entity that is engaged in shipping, third-party logistics, freight brokerage, truck brokerage, or supply-chain management services in the Continental United States." (Verified Complaint ¶27.) Not even the reference to the Continental United States provides a geographical limitation because foreign companies could easily offer services inside the Continental United States. TQL's restrictive covenants could therefore prevent Plaintiffs from accepting employment anywhere in the world.

Moreover, TQL's definition of a competing business as any transportation-intermediary business that handles third-party logistics is overbroad because that definition could encompass other forms of transportation by rail, sea and air. In fact, TQL's restrictive covenants would prevent Plaintiffs from working for companies that ship products from other countries to the United States by sea, a service that in no way directly competes with ground transportation within the United States. TQL's restrictive covenants, which extend into non-competing lines of business, are unenforceable because they are even more burdensome than those in *Parma.* Moreover, Plaintiff has no trade secrets, nor was he as crucial to his employer's success as discussed in Section III.A.4.

TQL's deliberate drafting of language so overbroad should lead this Court to infer that TQL was trying to insulate itself from ordinary competition instead of protecting its legitimate

7

interests. *See S & S, Inc. v. Kuret*, 1993 Ohio App. LEXIS 2442, at *6 (8th Dist., May 13, 1993)

(noting that the employer "tried to impose what it thought would be the maximum time allowed

rather than what was necessary to protect its interests"). Accordingly, the five covenants are

unenforceable as overbroad.

> **2.      The Restrictive Covenants Insulate TQL From Ordinary Competition By Prohibiting Mr. Dangelo From Working With Clients With Whom He Had No Contact While At TQL.**

Generally, the only business interests sufficient to justify enforcing a non-compete

agreement are "preventing disclosure of the former employer's trade secrets or the use of the

former employer's proprietary customer information *to solicit the former employer's customers*."

*Brentlinger Enterprises v. Curran*, 141 Ohio App. 3d 640, 649, 752 N.E.2d 994, 1001 (10th Dist.,

2001) (citation omitted) (emphasis added). In contrast, a restrictive covenant that prevents an

employee from working with clients or customers with whom he had no contact in his previous

employment is unreasonable. *See National Interstate Ins. v. Perro*, 934 F. Supp. 883 (N.D. Ohio

1996). In *Perro*, the employee was the principal sales contact for his previous employer in his

six-state territory before accepting a position with a competitor. *Perro*, 934 F. Supp. at 887.

Because all of the employee's former customers were within his six-state territory, the court held

that restraining him from contacting customers outside that six-state territory would impose a

burden greater than necessary for the former employer's protection. *Id.* at 891. Likewise, in

*E.P.I. of Cleveland v. Basler*, 12 Ohio App. 2d 16, 21-23, 230 N.E.2d 552, 556-57 (1967), the

Eighth District Court of Appeals held that restraining a former employee from doing business

within 200 miles of the center of Cleveland when the former employer had no clients in 91

percent of that area was "not necessary for the protection of plaintiff's business."

8

TQL's restrictive covenants clearly restrain Plaintiff from doing business with companies with whom he had absolutely no contact while at TQL. The five covenants purport to ban the Plaintiff from the industry altogether–both with regard to all TQL customers *and* prospective customers. (Verified Complaint ¶¶ 26-30.) TQL serves over 6,000 clients and employs over 500 LAEs at any one time. (*Id.* ¶¶9-10.) Mr. Dangelo, however, personally served less than one percent of these customers as an LAE. (*Id.* ¶18.) Even more troubling, the restrictive covenants also purport to ban Plaintiff from working with some 50,000-plus prospective customers in the U.S. not being served by TQL. (*Id.* ¶12.) TQL's restrictive covenants define their restraints not in terms of clients or even a rough geographical approximation, but in the broadest occupational terms possible. (*Id.* ¶¶26-30.) If enforced, they would oust Plaintiff from the industry all together. Because the covenants seek to restrict mere ordinary competition, they are unenforceable.

### 3. The Restrictive Covenants Act As A Bar To Mr. Dangelo's Sole Means of Support By Preventing Him From Working In Any Position Whatsoever With A Competitor.

A restrictive covenant that bars an employee's sole means of support by exceeding the scope of his original employment is unreasonable. *See, e.g.*, *Trionix Research Laboratory, Inc. v. Dameron*, 1990 Ohio App. LEXIS 5047 (8th Dist., Nov. 21, 1990). In *Trionix*, two employees left the nuclear imaging department of a company called Picker International, Inc. to work in the nuclear imaging department of a company called Trionix Research Laboratory, Inc. *Trionix*, 1990 Ohio App. LEXIS 5047, at *3-5. After working under restrictive covenants for several months, both employees returned to their original employer, Picker, where they started working with technical systems that differed from Trionix's systems. *Id.* at 4-6. The restrictive

9

covenants, however, would have completely barred the employees from working not just in nuclear imaging subfield but in the diagnostic imaging field in general. *Id.* at *4. The Eighth District Court of Appeals declined to enforce the restrictive covenants on the grounds that they far exceeded the scope of the employees' actual work for Trionix and would bar them from their sole means of support. *Id.* at *13.

TQL's restrictive covenants likewise exceed the scope of Plaintiff's original employment by completely ousting him from the transportation brokerage industry as discussed in Section III.A.1. In doing so, the restrictive covenants further bar Plaintiff's sole means of support because Plaintiff has little experience outside the transportation brokerage industry. (Verified Complaint ¶14.) Mr. Dangelo started at TQL three months after graduating from college and has not worked anywhere else since then. (*Id.*) Plaintiff's knowledge, skill set and experience all relate specifically and uniquely to the transportation brokerage industry. (*Id.*) Moreover, Mr. Dangelo is his family's primary breadwinner. (*Id.* ¶13.) Ousting him from the transportation brokerage industry, which the covenants purport to do, would effectively deprive Mr. Dangelo and his family of their livelihood.

### 4. Mr. Dangelo Was Not The Sole Contact With His Clients And Did Not Possess Any Trade Secrets.

An employer does not have a legitimate interest to protect when its employee was not the sole contact with customers and did not possess any of the employer's trade secrets. *See Kuret,* 1993 Ohio App. LEXIS 2442, at *6-9; *see also Trionix,* 1990 Ohio App. LEXIS 5047, at *12-13. In *Kuret,* the employee signed a restrictive covenant not to compete with his packaging company employer for 18 months but went to work for a competitor six weeks after being terminated. *Id.*

10

at *2. The court noted that the employee was not the sole contact with his employer's customers, did not possess a list of the employer's more than 2,000 customers, did not possess any trade secrets and did not disclose any confidential information to his former employer's competitor. *Id.* at *6-8. Finding that the real object of the covenant was to restrain the employee's right and ability to be employed, the court held that the restrictive covenant was unreasonable and unenforceable. *Id.* at *8-9. The court further refused even to modify the covenant because it was "unenforceable on its face." *Id.* at *7-9 (citing *Professional Investigations & Consulting Agency, Inc. v. Kingsland*, 69 Ohio App. 3d 753, 760, 591 N.E.2d 1265, 1269-70 (1990)).

Mr. Dangelo was not TQL's sole contact with the clients on whose account he worked and did not possess any trade secrets, either. (Verified Complaint ¶¶20, 23-24.) In fact, Mr. Dangelo worked on a team that included a Logistics Coordinator named Kevin Payne. (*Id.* ¶20.) Mr. Payne assisted Mr. Dangelo in a variety of ways, including but not limited to making appointments, setting up telephone calls directly with clients, and e-mailing directly with clients. (*Id.*) Mr. Payne had a strong operational knowledge of the clients with whom Mr. Dangelo interacted and would have been well-equipped with the necessary knowledge of those clients to transition them to other LAEs. (*Id.* ¶23.) Moreover, it makes even less sense here to enforce the covenants given that Mr. Legg is a former TQL owner. (*Id.* ¶11.) He will be in business with or without Mr. Dangelo, whose knowledge of TQL is nowhere near the level of Mr. Legg's.

**B.    Mr. Dangelo Will Suffer Irreparable Harm If This Court Denies His Motion.**

As discussed above in Sections III.A.1 and III.A.3, enforcing the covenants would completely oust Mr. Dangelo from his industry and deny him the right to support his family.

**C.    No Third Parties Will Be Harmed By Granting An Injunction.**

11

No third parties will be harmed by the granting of an injunction in this case. In fact, granting the relief requested would benefit the clients as it would enhance their options in choosing freight brokers.

**D.      The Public Interest Will Not Be Disserved By Granting An Injunction.**

To the extent that the public has any interest in an equitable injunction, courts "are concerned primarily that the issuance of the injunction will not disserve (as opposed to serve) the public interests." *Escape Enterprises, Ltd. v. Gosh Enterprises, Inc.*, 2005 Ohio 2637, at ¶47, 2005 Ohio App. LEXIS 2466, at *29-30 (2005) (quoting *Gateway Eastern Ry. Co. v. Terminal R.R. Assoc. of St. Louis*, 35 F.3d 1134, 1139, fn. 3 (7th Cir. 1994)).

In this case, the public has no involvement in the dispute between Mr. Dangelo and TQL. Regardless, the public interest, if any, will not be disserved by this Court's granting an injunction, as the public does not have an interest in imposing on a party a contract that by its very terms is unenforceable against that party. In this instance, the facts clearly demonstrate that the restrictive covenants are unreasonable and unenforceable against Mr. Dangelo.

**IV.     CONCLUSION**

For all the reasons stated herein, Plaintiff Jeffrey Dangelo request that this Court order a temporary restraining order and preliminary injunction enjoining and restricting Defendant TQL from threatening or seeking enforcement of the restrictive covenants.

Respectfully submitted,

Megan E. Clark (0065159)
Randolph H. Freking (0009158)
Trial Attorney for the Plaintiff
FREKING & BETZ, LLC
525 Vine Street, Sixth Floor
Cincinnati, OH 45202
Phone: (513) 721-1975
Fax: (513) 651-2570
*mclark@frekingandbetz.com*
*randy@frekingandbetz.com*

13

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was sent to Barry F. Fagel, Esq. and Brad

McPeek at Lindhorst & Dreidame Co., L.P.A. via facsimile (513) 421-0212 this 21st day of July

2009.

*Megan E Clark*

14