UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JEFFREY A. DANGELO | : | Case No. 1:09cv512 |
| Plaintiff, | : | (Judge Michael R. Barrett) |
| | : | **DEFENDANT TOTAL QUALITY LOGISTICS, LLC'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| vs. | : | |
| | : | |
| TOTAL QUALITY LOGISTICS, LLC. | : | |
| Defendant. | : | |

For its memorandum in opposition to the Plaintiff Jeffrey Dangelo's Motion for Temporary Restraining Order and Preliminary Injunction, the Defendant Total Quality Logistics, LLC. ("TQL"), states as follows:

**I.   Preliminary Statement.**

The factual assertions in this Memorandum are supported by the attached Affidavit of Jeff Montelisciani, Vice-President of Sales for TQL.

**Introduction.**

**TQL Teaches Its Employees The Logistics Business And Gives Them Access To Customers And Confidential Information.**

The Defendant TQL is a third party freight broker. As a third party freight broker, TQL has no trucks of its own. Instead, TQL links entities with freight to available carriers. For its services, TQL receives a fee.

From the beginning, TQL has been a local success story. The company was founded in 1997 by two individuals, Ken Oaks and Ryan Legg (who has since left the company.) Ten years later, TQL employs over one thousand people. Based in Clermont County, it is one of the fastest growing logistics companies in the country.

517998v1

Like any service company, TQL does business with its customers through its employees – who enjoy most of the daily client interaction. To protect its investment in its employees and to prevent disclosure of confidential information, TQL takes extensive security precautions. For instance, TQL limits software access to authorized persons with proper passwords and only approved persons with ID badges are permitted to enter TQL's offices. TQL also monitors employee emails and maintains security cameras on its premises. TQL also requires its employees to agree to a one-year non-compete/confidentiality agreement.

**TQL's Trade Secrets**

TQL regards certain company information and processes as proprietary and trade secrets. Last year, Judge Robert P. Ringland, then a judge of the Clermont County Common Pleas Court, reached the same conclusion. In *Total Quality Logistics v. Zavagno*, Judge Ringland found (among other things) that certain TQL information, including its pricing, training methods, rate and transaction histories, client lists, and carrier lists are trade secrets; and that if divulged, TQL's trade secrets would grant competitors immediate access to sensitive pricing, rates, and customer information.[1]

**Dangelo's Career At TQL.**

**Start And Training.**

The Plaintiff Jeff Dangelo started with TQL on November 13, 2002. He had no previous experience in the logistics business prior to joining TQL. Starting from scratch, TQL had to train him extensively. This training lasted for six months.

---

[1] Clermont Cty. Court of Common Pl. Case No. 2008 CVC 00498, *Decision, Order, and Entry* (March 19, 2008) (copy attached).
517998v1

2

In connection with his employment, Dangelo signed TQL's *Employee Non-Compete, Confidentiality And Non-Solicitation Agreement,* a copy of which is before the Court as an attachment to the Montelisciani Affidavit. It prohibits him from (among other things) disclosing confidential information and trade secrets; from consulting with competitors; from working for competitors; and from disrupting or attempting to disrupt TQL's relationships with its customers.

### Jobs With TQL And Information Acquired.

Upon the completion of his training, Dangelo worked as a Logistics Account Executive. In that capacity, he acted as a broker. A broker is essentially a sales person. He is responsible for developing customers and selling to existing TQL customers. He is responsible for obtaining freight orders for customers and then arranging transportation of the freight.

So that Mr. Dangelo could perform his duties, he was entrusted with TQL's confidential information and materials, including detailed expense information; detailed pricing, profitability, and margin information; non-public information about the individualized needs and requirements of particular customers; customer lists and specific contact information within those organizations that is not publicly known, such as cell phone numbers and email addresses; confidential information about routes and lanes used by particular carriers and to ship particular products; confidential information about carriers, including performance ratings, certifications, equipment, lanes, and products carried; profit and loss information; business procedures and operating methods; TQL's specialized software programs; and TQL's marketing and business strategy.

### Earning History/Work History.

Mr. Dangelo not only worked as a broker, but in 2006 he worked as a group sales manager supervising other brokers. In 2008, he became part of the national account group, which is basically an outside sales position. In 2007, he moved back to a job as a broker. As a broker this year, he was in the top 20% of all brokers in sales generated.

Mr. Dangelo had a number of customers at TQL. One of his customers was one of the largest consumer product companies in the world. He was able to obtain this customer with the help of other TQL employees. Mr. Dangelo was given a top 10 TQL customer account when one of the brokers who called on this account became ill and left work due to a disability. Mr. Dangelo was the primary contact with his customers.

### Voluntary Termination Of Employment.

Mr. Dangelo <u>voluntarily</u> terminated his employment with TQL. He was neither pressured nor requested to resign.

### MegaCorp Logistics

Dangelo claims that MegaCorp Logistics wishes to hire him. Ryan Legg is the owner of MegaCorp Logistics. Legg is the individual who started TQL along with Ken Oaks. Over three years ago, Oaks purchased Legg's interest in TQL. Legg then moved to Wilmington, North Carolina. As part of the Buy-Sell Agreement, Legg had a three year non-compete, which he honored. After the expiration of the non-compete, Legg got back in the freight brokerage business. Despite living in North Carolina, he decided to open an office in Northern Kentucky. Interestingly, Legg signed Dangelo's first non-compete Agreement wherein Legg implicitly and explicitly acknowledged that TQL has trade secrets and that Dangelo could not disclose or use those trade secrets.

517998v1

Dangelo also agreed in the original agreement that he would not compete against TQL for two years.

### TQL Is Entitled To The Protections Of Its Non-Compete Agreement In Order to Protect TQL From Unfair Competition

Plaintiff TQL is entitled to the protections of its one year non-compete agreement in order to prevent Mr. Dangelo from unfairly competing with TQL. The agreement is the only available means by which TQL can halt former employees (like Mr. Dangelo) from hijacking their trade secrets and customer relationships for the benefit of TQL's competitors.

Jeff Dangelo worked at TQL for more than six years. During that time, he served in management and saw all aspects of the logistics business. He had extensive sales responsibilities and developed intimate knowledge of TQL's business methods, clients, and strategies. He also had access to other highly confidential (and valuable) information – including information about TQL's proprietary software, TQL's current and potential customers (with specific contact information not publicly known), its vendors and referral sources, and its business processes, pricing and marketing strategies, and confidential carrier information. Given his level of access and his intimate familiarity with TQL's processes and its trade secrets, TQL's one year non-compete is entirely reasonable.

II. **Law and Argument.**

Before analyzing the Plaintiff's TRO request under the criteria of F.R.C.P. #65, two preliminary arguments are presented, either or both of which should make such analysis unnecessary.

## An Injunction Should Not Be Granted Against the Institution of an Action Where a Complete Defense May Be Made in That Threatened Action

What Mr. Dangelo actually seeks here is an injunction against TLQ to prevent it from enforcing its contractual rights. Put another way, the Plaintiff (preemptively) seeks an injunction against the Defendant barring it from seeking an injunction against him.

As of now, TQL has not sought to enforce the non-compete agreement against Mr. Dangelo; nor is there any allegation that it is even threatening to do so. The question, therefore, naturally arises: Why can't the Plaintiff wait until such an action is filed (if it ever is), and then defend it – employing the same arguments and authorities relied upon by him in this case?

It is axiomatic that a Court will not entertain a claim for equitable relief where the Plaintiff has an adequate remedy at law.[2] Mr. Dangelo is the Plaintiff in this case, but there will be no case or controversy between him and TLQ unless and until TLQ seeks relief against him. Where such a person has defenses against an adversary like TLQ (in this instance, only a potential adversary), he is <u>not</u> entitled to seek injunctive relief against that adversary.[3]

For example, a demurrer was sustained (and upheld on appeal) where the Plaintiff sought to enjoin the clerk of a common pleas court from issuing an execution to the sheriff, there being ample defenses once that process was under way.[4]

---

[2] <u>Mawhorter v. Armstrong</u>, 16 Oh. 188 (1847); <u>Salem Iron Company v. Hyland</u>, 74 Oh. State 160 (1906); <u>Haig v. Ohio State Board of Education</u>, 62 Ohio State 3d 507, 584 N.E.2d 704 (1992); <u>Camp Washington Community Board, Inc. v. Rece</u>, 104 Ohio. App. 3d 750, 663 N.E.2d 373 (1995), discretionary appeal not allowed 74 Ohio State 3d 1458, 656 NE2d 952; <u>State v. Martin</u>, 92 Ohio App. 3d 3084, 635 N.E.2d 1289 (1993).
[3] <u>Quebec Bank of Toronto v. Weyand & Jund</u>, 30 Ohio State 126 (1876)
[4] <u>Wittstein v. Huntsman</u>, 2 Ohio App. 51 (1913)
517998v1

Likewise, in real estate disputes, injunctive relief cannot be resorted to where other avenues are available to protect one's rights, avenues such as ejectment or forcible entry and detainer.[5]

This is precisely what Ohio's First District Court of Appeals twice held in the same year.[6] In O'Brien, a tenant sought to enjoin his landlord from evicting him, pointing out that a former judgment between the parties had settled the matter. The common pleas court denied the injunction and the Court of Appeals affirmed, holding (in its syllabus):

> "An action will not lie to enjoin the prosecution of another action in the same court, on the ground that such other action is a vexatious attempt to relitigate issues already finally determined. Under Section 11315, General Code, the litigant may assert in such other action his claim of res judicata to defeat the cause, and may secure an injunction in that action against future litigation on the same point."

In Royal Indemnity, a casualty insurer sought to compel personal injury claimants to abide by the terms of their settlement agreement with its insured. The insurer was denied the relief that it sought. At page 183 of 29 N.E.2d, the opinion of the much respected late Judge Stanley Matthews holds:

> "The court therefore holds that this action cannot be maintained because the plaintiff's remedy at law is adequate, by reason of the pendency of the actions upon the original claims in which the plaintiff here can secure all the relief which it would be possible to award it in this action."

These two rulings lead the authors of Ohio Jurisprudence, Third, to declare[7]:

---

[5] Turnbull v. City of Xenia, 80 Ohio App. 389, 69 N.E.2d 378 (1946); Standard Oil Company v. Carr, 24 O.L.A. (App. 1937)
[6] OBrien v. Norwood, 65 Ohio App. 269, 29 N.E.2d 635 (1940); Royal Indemnity Company v. McFadden, 65 Ohio App. 15, 29 N.E.2d 181 (1940)
[7] Ohio Jurisprudence 3d §123
517998v1

> "Injunction will not be granted against the institution or prosecution of an action where a full defense may be made in the pending or threatened action."

Other Ohio Courts have issued comparable rulings, for example the case of Ream v. Gaskill,[8] another situation where a tenant sought to enjoin his landlord from evicting him. Noting that, if what the Plaintiff alleged was correct, "he has a complete defense," the Court of Appeals concluded that "equity should not intervene."[9]

Next we cite Krause v. McBride,[10] which approves the trial court's refusal to enjoin a county auditor and treasurer from filing a foreclosure action against the plaintiff-property owner for unpaid taxes.

Finally, we believe that the case of Cincinnati v. The Trustees of Cincinnati Southern Railway[11] is instructive. A lease from the city-owned Cincinnati Southern to the operating carrier, Cincinnati, New Orleans, and Texas Pacific Railway, contained an arbitration clause. CNO & TP proposed to convene an arbitration as to certain claims against the Cincinnati Southern. The City of Cincinnati filed an injunction action to prevent the arbitration, alleging (among other things) that some of the City's asserted claims were outside the scope of the arbitration clause. Even though the Circuit Court agreed, it upheld the denial of injunctive relief, pointing out that, because one of the submitted claims was proper, the arbitration should proceed. The Circuit Court then addressed the question of whether it should at least enjoin the arbitration of the non-covered issue, but declined with this explanation:

---

[8] 480.08.56, 70 N.E.2d 475 (App. 1946)
[9] 70 N.E.2d at 477
[10] 4 OLA 218 (App. 1925)
[11] 6 OCC 247(1892)
517998v1

> "The sufficient answer to such a claim would be that the law gave the right to the plaintiff to bring this action in the courts, and that the presumption must be that if the plaintiff has no claim the court will say so."

The appellate court then applied this principle to the arbitration context, holding that:

> ". . . if the arbitrators should proceed to adjudicate matters not covered by the agreement of submission, an award on the merits thereof would be void, and on petition therefor would be so declared and be set aside by the court"

It would seem logically to follow, therefore, that if a person situated in Mr. Dangelo's position has defenses (legal and/or equitable) to a claim (legal and/or equitable) which TLQ might (someday) assert against him, the time to litigate those defenses is not now; and the place to litigate them is not in this Court.

### By Analogy, Federal Legislation Precludes the Plaintiff's Claim for Injunctive Relief from Proceeding

A specific federal statute, 28 U.S.C.§2283, provides as follows:

> "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

That statute has been applied in the context of an Ohio labor dispute in Amalgamated Clothing Workers of America v. Richman Brothers.[12] Even though the union was claiming that the entire controversy was preempted by federal law and even though the Supreme Court recognized that such legislation, specifically the Taft-Hartley

---

[12] 348 U.S. 511 (1955)
517998v1

9

Act, could have been invoked, state litigation must, in view of §2283, be allowed to run its course.[13]

We fully acknowledge that, by its literal terms, §2283 applies only to already <u>pending</u> state actions. However, by analogy, the policy which that statute implements is wholly consistent with the Ohio authorities we have just cited, cases prohibiting a potential defendant from securing injunctive relief prohibiting a potential adversary from even initiating his claim against the injunction-seeker.

### Request for TRO and Injunction

F.R.C.P. #65 governs Dangelo's request for emergency injunctive relief. "Temporary restraining orders and preliminary injunctions are extraordinary remedies which should be granted only if the movant carries his burden of proving that the circumstances clearly demand it."[14] This Court must balance four factors in determining whether to grant injunctive relief:

  (1) whether the movant has a strong likelihood of success on the merits;

  (2) whether the movant would suffer irreparable injury without the injunction;

  (3) whether the issuance of the injunction would cause substantial harm to others; and

  (4) whether the public interest would be served by issuance of the temporary restraining order or preliminary injunction.[15]

As the party seeking a restraining order, Mr. Dangelo has the burden of persuasion on

---

[13] 348 U.S. at 521
[14] *Overstreet v. Lexington-FayetteUrban Cty. Govt.*, 305 F.3d 566, 573 (6th Cir. 2002).

[15] *Tumblebus, Inc. v. Cranmer*, 399 F.3d 754, 759 (6th Cir. 2005).

517998v1

each of these factors.[16] Giving an injunctive relief is an extraordinary remedy, that burden is a heavy one.[17]

### Dangelo Has No Likelihood Of Success.

### The Court Does Not Have Jurisdiction Over Dangelo's Claim For Declaratory Relief.

Dangelo asserts a single claim for relief. Specifically invoking the Ohio Declaratory Judgment Act, he asks the Court to find his non-compete agreement with TQL unenforceable. The body of the Complaint does not mention injunctive relief.

But Dangelo cannot succeed on that claim, and his first hurdle is jurisdiction. As more fully set forth in TQL's motion to dismiss, which has been filed with the Court and which is incorporated herein by reference, this Court cannot decide a case under a state declaratory judgment statute. A district court can only issue declaratory relief under the Federal Declaratory Judgment Act, 28 U.S.C, §2201, but Dangelo has not pled those grounds here.

Furthermore, this Court does not have subject matter jurisdiction to issue the advisory opinion that Dangelo wants. This Court can only decide actual cases and controversies; it cannot speculate on hypothetical events that have not occurred (and may never occur.) Dangelo's "wish" to be employed with Megalogisticscorp falls into this speculative realm.

Finally, because Dangelo's job with Megalogisticscorp is just a hypothetical – "a wish" – he cannot identify an amount in controversy. Without knowing if he has a job, what he will be paid, or what he is capable of earning in a job which is not violative of

---

[16] *Stemberg v. Checker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978).

[17] *Beeler v. Deutsche Bank Natl. Trust Co.*, 2008 WL495482, *1 (citing *Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Other Truck Drivers Local No. 70 of Alameda Cty.*, 415 U.S. 423, 442-43).
517998v1

the non-compete, Dangelo can only offer speculation. This is insufficient for purposes of 28 U.S.C. §1332.

### Even If The Court Had Jurisdiction, Dangelo Is Unlikely To Succeed On The Merits.

Dangelo's claims also fail on their merits. Assuming (for the sake of argument) that this Court decides it has jurisdiction, Dangelo's one year non-compete agreement is reasonable and enforceable.

First, Dangelo's 2008 non-compete is supported by valid consideration. The Ohio Supreme Court has held that continued employment constitutes sufficient consideration to support a non-competition agreement.[18] Consideration is defined as "either a detriment to the promisee or a benefit to the promisor."[19] In *Lake Land*, the Ohio Supreme Court made it clear that the consideration received in exchange for an employee's assent to a non-competition agreement was the employer's forbearance of its right to fire the employee <u>at that very moment</u>.[20]

Second, Ohio courts have repeatedly upheld injunctive relief for breaches of covenants not to compete.[21] "[R]estrictions upon an employee will be enforced to the

---

[18] *Lake Land Emp. Group of Akron, LLC v. Columber*, 101 Ohio St.3d 242, 246-248 (2004).

[19] *Id.* at 247 (citing *Irwin v. Lombard Univ.*, 56 Ohio St. 9 19 (1987))

[20] *Lake Land*, 101 Ohio St. 3 at 246. See also *Willis Refrigeration, Air Conditioning and Heating, Inc.v. Maynard*, 2000 WL36102, *5 (Ohio App. 12 Dist. 2000) (holding that continuing employment is sufficient consideration because due to the nature of at-will employment, the employer is not required to continue the employment relationship for any period of time); *Financial Dimensions, Inc. v. Zifer*, 1999 WL1127292, *3 (Ohio App. 1 Dist. 1999).

[21] *Rogers v. Runfola & Associates, Inc.* (Ohio 1991), 57 Ohio St. 3d 5, 9, 565 N.E.2d 540; *Raimonde v. Van Vlerah* (Ohio 1975), 42 Ohio St. 2d 21, 325 N.E.2d 544; *Briggs v. Butler* (Ohio 1942), 140 Ohio St. 499, 45 N.E.2d 757; *Mike McGarry & Sons, Inc. v. Gross* (Ohio App. 8 Dist. 2006), 2006 WL 895094, 2006-Ohio-1759(upholding trial court's grant of temporary restraining order and permanent injunction for former employee's breach of non-compete agreement); *Procter & Gamble Co.*, 140 Ohio App. 3d at 270 (holding that, under Ohio law, non-compete agreements that are reasonable are enforced and those that are unreasonable are "enforced to the extent necessary to protect an employer's legitimate interest");
517998v1

extent necessary to protect an employer's legitimate interest."[22] "A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if it (1) is not greater than is required for the protection of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public."[23]

The reasonableness of the restraint is a question of law. Courts consider the language of the restraint as well as the circumstances surrounding its formation and application in determining whether it is reasonable.[24] To this end, courts may consider the following factors:

- geographic and temporal limits, if any;

- whether the employee represents the sole customer contact;

- whether the employee possesses confidential information or trade secrets;

- whether the clause seeks to restrain ordinary, rather than unfair, competition;

- whether the clause stifles the pre-existing skills of the employee or only those skills which were developed while working for the employer;

- the balance of the clause's detriment to employer and employee;

- whether the clause restricts the employee's sole means of support; and

- whether the restricted employment is merely incidental to the main employment.[25]

---

*Columbus Medical Equipment Co. v. Watters* (Ohio App. 10 Dist. 1983), 13 Ohio App. 3d 149, 468 N.E.2d 343.

[22] *Id.*

[23] *Raimonde*, 42 Ohio St. 2d at 26.

[24] *See Raimonde*, 42 Ohio St. 2d at 25; *Rogers*, 57 Ohio St. 3d at 8.

[25] *Rogers,* 47 Ohio St.3d at 8, 565 N.E. 2d 540.

517998v1

"Courts are empowered to modify or amend an unreasonable employment agreement to the extent necessary to protect an employer's legitimate interest."[26] Under Ohio law, an employer seeking to enforce a non-compete agreement against a former employee need not demonstrate actual harm.[27] "[A] threat of harm is a sufficient basis on which to grant injunctive relief."[28] And "the actual threat of harm" exists when (as here) "an employee possesses knowledge of an employer's trade secrets and begins working in a position that causes him to directly compete with the former employer...."[29]

On this point, *UZ Engineered Products Co. v. Midwest Motor Supply Co., Inc.* is instructive.[30] In that case, the court stated that "...an employer has a legitimate interest in preventing a former employee from using the skill, experience, training, and confidential information the former employee has acquired during the employee's tenure with his employer in a manner advantageous to a competitor in attracting business, regardless of whether it was an already established customer of the former employer."[31]

By this authority, the Agreement is enforceable. As set forth below, it does not restrict competition any more than is required for TQL's protection; it does not impose undue hardship on Dangelo; and it is not injurious to the public interest.

---

[26] *Id.* at 26.

[27] *Convergys Corp. v. Tackman* (Ohio App. 1 Dist. 2006), 169 Ohio App. 3d 665, 864 N.E. 2d 145.

[28] *Id*, at 666-67 (citing *Procter & Gamble Co. v. Stoneham*) Ohio App. 1 Dist. 2000), 140 Ohio App. 3d 260, 267, 747 N.E. 2d 268).

[29] *Id.* at 667.

[30] (Ohio App. 10 Dist. 2001), 147 Ohio App. 3d 382, 396, 770 N.E. 2d 1068, 1080, ¶ 39.

[31] *Id.*

517998v1

## The Restraints Are Necessary To Protect TQL.

TQL's interests are legitimate. In the hyper-competitive world of third party logistics, brokers and sales employees hold critical positions of responsibility. They are their employer's primary contacts with customers and carriers. To succeed, they must develop close relationships with company customers. These relationships are essential for generating and maintaining business.

To this end, TQL trained Dangelo (at its sole cost) and gave him the tools necessary to perform his job and to succeed. For instance, in connection with his employment, TQL entrusted Dangelo with its existing customer and carrier source lists. And as TQL developed those lists (at its expense), TQL also entrusted him with that information. To further aid Dangelo in his endeavors, TQL also provided him with access to TQL's proprietary software, pricing and marketing strategies, and extensive information about TQL's other confidential techniques, systems, and methods. TQL helped Dangelo in obtaining a large customer. TQL also gave Dangelo one of TQL's top customers.

In view of the confidential information and customer and carrier knowledge possessed by Dangelo (and the value of this information to TQL and its competitors), the restrictions in the Agreement are reasonably tailored to protect TQL's interests. First, the restrictions apply to the entire continental United States because TQL brokers serve customers and carriers <u>throughout</u> the lower forty-eight states. Because brokerage work can be performed from almost anywhere, a geographic scope that includes anything less than the continental United States would be worthless. And, indeed, nationwide (and even worldwide) geographic restrictions have been upheld in

517998v1

15

similar circumstances.[32]

Citing cases from 1952 and 1964, Dangelo argues that geographic restrictions encompassing areas national in scope are unreasonable. These cases reflect a much older view – one unreflective of modern business. And in an increasingly global economy, courts across the country have found non-compete agreements with national (or even worldwide) restrictions to be reasonable.[33] Significantly, the Third Circuit recently held that a *per se* rule against broad geographic restrictions is "hopelessly antiquated" in an increasingly global economy.[34] And as previously stated, Ohio courts have adopted this view in upholding non-compete agreements with national and even global geographic restrictions.[35]

Second, the one-year prohibition is also narrowly tailored to protect TQL from the outright conversion of its good will.[36] (In actuality, the remaining restrictions on the

---

[32] *Duracote Corp. v. Ryan* (Ohio App. 11 Dist. 1983), 1983 WL 6234, *1 (holding that, where a former employee's employment gave him access to employer's secrets and customer lists in the United States, a non-competition agreement restraining the employee from competing in the United States was reasonable; *Ganguly v. Meade Digital Sys.* (Ohio App. 2 Dist. 1984), 1984 WL 3858, *1 (upholding as reasonable worldwide geographic limitation in non-competition agreement).

[33] See e.g, *Quaker Chemical Corp. v. Varga*, 509 F. Supp. 2d 469 (E.D. Pa. 2007); *Cole v. Champion Enterprises, Inc.*, 305 F. Appx. 122 (4th Cir. 2008); *Genesis Medical Imaging, Inc. v. DeMars*, 2008 WL4180263 (E.D. Ky. 2008); *Pulse Technologies, Inc. v. Dodrill*, 2007 WL 789434 (D. Or. 2007); *Scholastic Funding Group, LLC v. Kimble*, 2007 WL1231795 (D.N.J. 2007); *Intermetro Indus. Corp. v. Kent*, 2007 WL1140637, (M.D. Pa. 2007).

[34] *Victaulic Co. v. Tieman*, 499 F.3d 227 (3rd Cir. 2007).

[35] *Durocoat Corp.*, 1983 WL6234; *Ganguly*, 1984 WL3858.

[36] See *Raimonde*, 42 Ohio St. 2d at 25; see also *UZ Engineering Products Co. v. Midwest Motor Supply Co., Inc.* (Ohio App. 10 Dist. 2001), 147 Ohio App. 3d 382, 397, 770 N.E.2d 1068 (affirming trial court's determination that a two year territorial non-compete covenant was reasonable and enforceable as a matter of law because, through their employment with Plaintiff, the Defendants had acquired "extensive information regarding Plaintiff's products and sales practices, including pricing that would be advantageous to a competitor in soliciting customers, regardless whether the customer had been former or existing customers of plaintiff or its former employees."); *Duracote Corp. v. Ryan* (Ohio App. 11 Dist. 1983), 1983 WL 6234, *1 (holding that, where a former employee's employment gave him access to employer's secrets and customer lists in the United States, a non-competition agreement restraining the employee from competing in the United States was reasonable; *Ganguly v. Meade Digital Sys.* (Ohio

517998v1

Plaintiff are closer to 10 months.) Given the time and resources that TQL invests in employee training and the confidential and important information known by Dangelo, anything less than a one-year restriction is insufficient to protect TQL from marauding competitors and opportunistic employees who would misappropriate (in an instant) the strategies, customers, information and methods that TQL has developed in the decade since it was founded. Under similar circumstances, other Ohio courts have enforced restrictions even longer than one year.[37]

The restraints contained in the Agreement are essentially a private reaffirmation of Dangelo's legal obligation not to misappropriate assets – including information and relationships developed by TQL (at its sole expense). These restrictions are reasonably related to TQL's legitimate business interests and are no greater than required to protect those interests.

### The Restraints Do Not Impose Undue Hardship On Dangelo Nor Has He shown Irreparable Injury.

In examining whether non-compete restraints impose undue hardship, Ohio courts focus on the activities restrained and the geographic and temporal scope of such restrictions.[38] In this case, the restraints on Dangelo's activities do not unduly burden him. By its terms, the agreement at issue restrains Dangelo (for just the next 10 months) only from contacting TQL customers and carriers and only from working for

---

App. 2 Dist. 1984), 1984 WL 3858, *1 (upholding as reasonable worldwide geographic limitation in non-competition agreement).

[37] *Raimonde*, 42 Ohio St. 2d at 28 (three-year restraint on employment); *Columbus Medical Equipment*, 13 Ohio App. 3d at 347 (two-year restraint on employment); *UZ Engineered Products Company*, 147 Ohio App. 3d at 402 (recognizing that "an employee who goes to work for a direct competitor within two years can cause harm to the former employer").

[38] *Raimonde*, 42 Ohio St. 2d at 25.

517998v1

TQL competitors. This (reasonable) restraint merely prevents Dangelo from unfairly competing with TQL and from trading on the goodwill, information, and relationships that TQL has developed. Several courts have held agreements with the same or similar temporal scope to be reasonable.[39]

The Agreement does not prevent Dangelo from earning a living. Dangelo can utilize his education and skills in sales and management to work in a variety of other industries and positions.

Furthermore, Dangelo voluntarily quit TQL. It seems disingenuous, more than two (2) months after he voluntarily left his employment with TQL, to now come before this Court and claim that he will have irreparable harm if he can't take a job with TQL's competitor. In addition, by signing Dangelo's first Non-Compete Agreement, the owner of this competitor has acknowledged the importance of TQL enforcing its Non-Compete and that TQL has trade secrets that can't be disclosed.

Finally, if the Plaintiff is granted a TRO, it would be TQL who would suffer irreparable injury for the reasons set forth above.

### The Agreement Is Not Injurious To The Public Interest

Finally, the restraint does not contravene public policy and is not against the public interest. To the contrary, it strikes an equitable balance between TQL's legitimate interest in protecting its business and Dangelo's ability to support himself. Dangelo came to TQL untrained. When he began his employment with TQL, he agreed to abide by his non-compete obligations. Having left TQL, he can seek and perform any other

---

[39] *Raimonde*, 42 Ohio St. 2d at 28 (three-year restraint on employment); *Columbus Medical Equipment*, 13 Ohio App. 3d at 347 (two-year restraint on employment); *UZ Engineered Products Co.*, 147 Ohio App. 3d at 402 (recognizing that "an employee who goes to work for a direct competitor within two years can cause harm to the former employer").

517998v1

job in the world—as long as that job does not require him (in the next 10 months) to call on TQL's customers or carriers, to disclose TQL's trade secrets, or to work for TQL competitors.

In short, the restraints are reasonably narrow. In order for TQL to continue to carry on its business without being endangered by "potentially veracious" former employees, the restraints are also essential and entirely justifiable.[40]

Further, these limited restrictions are in no way injurious to the public. To the contrary, the public is <u>benefited</u> – by protecting information and service businesses from misappropriation; by providing a predictable safeguard to such businesses so that they will continue to innovate and to grow in Ohio; by permitting TQL to protect its legitimate interests from unfair competition; and by upholding the public interest in enforcement of valid contracts.[41]

## III. Conclusion

For the foregoing reasons, the Plaintiff Total Quality Logistics, Inc., respectfully requests that the Court overrule Plaintiff's request for a temporary restraining order and a preliminary injunction.

---

[40] *Basic Computer Corp. v. Scott* (N.D. Ohio 1991), 791 F. Supp. 1280, 1289.

[41] *Gross v. Campbell* (Ohio App. 17 Dist. 1927), 26 Ohio App. 460, 471-72 ("If…there is one thing more than any other which public policy requires, it is that [people] of full age and competent understanding shall have the utmost liberty of contracting, and that contracts when entered into freely and voluntarily, shall be held good and shall be enforced by courts of justice.")

517998v1

Respectfully submitted,


/s/ Barry F. Fagel
Barry F. Fagel          (#0060122)
Bradley D. McPeek       (#0071137)
LINDHORST & DREIDAME
312 Walnut Street, Suite 3100
Cincinnati, Ohio  45202
Telephone:   (513) 421-6630
Facsimile:   (513) 421-0212
E-mail:      bfagel@lindhorstlaw.com
**Attorneys for Plaintiff**
**Total Quality Logistics, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of August, 2009 I electronically filed the foregoing with the Clerk of Court using the CM/ECF System which will send notification of such filing to the following:

Megan E. Clark, Esq.
Randolph H. Freking, Esq.
Freking & Betz, LLC
525 Vine Street, Sixth Floor
Cincinnati, Ohio  45202
*Attorneys for Plaintiff*


In addition, I hereby certify that on the date stated above, I have mailed by ordinary United States mail this document to above-named counsel.


/s/ Barry F. Fagel
Barry F. Fagel

517998v1

20